**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
TESLA WALL SYSTEMS, LLC,                             :       Index No. _____
                                                    :
                            *Plaintiff*,            :
                                                    :              **COMPLAINT**
                - against -                          :
                                                    :          **JURY TRIAL DEMANDED**
RELATED COMPANIES, L.P. and                          :
NEW HUDSON FACADES LLC,                              :
                                                    :
                            *Defendants*.           :
                                                    x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Tesla Wall Systems, LLC ("Tesla" or the "Company"), by and through its

attorneys, submits this Complaint against Defendants Related Companies, L.P. ("Related") and

New Hudson Facades LLC ("NHF") (collectively, "Defendants") and hereby alleges as follows:

## INTRODUCTION

1.      Related is one of the largest real estate development companies in the world,

worth well over $20 billion.  It has offices and developments in New York, London, Abu Dhabi,

and Shanghai, among other locations around the globe.  Related is owned by a number of

principal investors, including Stephen Ross, the multibillionaire who controls the company, and

sovereign wealth funds of countries such as Kuwait and the United Arab Emirates.  Currently,

Related is the lead developer of Hudson Yards, a historic $25 billion project in Manhattan,

widely considered to be the largest private real estate development in the history of the United

States and the largest development in New York City since Rockefeller Center.

2.      This lawsuit arises from a simple truth: The quest for riches often darkens the

sense of right and wrong.  In 2009, Tesla presented an unprecedented business opportunity to

Related, and Related's owners and executives immediately recognized the immense potential of

the plan.  These individuals decided to go into business with Tesla as its partner and then—not satisfied by their own wealth—betray Tesla by taking for themselves the fully-developed business operation that had taken Tesla years to create.

3.      More shocking still, Related betrayed Tesla by colluding with Tesla's then-President, Michael Budd, to form a competing company, NHF, to replace Tesla, using Tesla's confidential information and trade secrets to do so.  Related acted in secret, fraudulently concealing its illicit acts to ensure Tesla remained unaware of its plan to destroy the business. Budd, in turn, was rewarded handsomely for his disloyalty.  Related made him an executive and awarded him a substantial ownership interest in NHF.

4.      In November 2016, a New York jury held Budd accountable for his actions.  After trial, Budd was found liable for breaching his contract with Tesla and violating his fiduciary duty of loyalty to the Company through his illegal dealings with Related and his theft of Tesla's confidential information and trade secrets.  *See Tesla Wall Sytems, LLC v. Budd*, No. 1:14-cv-08564-LLS (SDNY).

5.      Like Budd, Related, as Tesla's partner and a fiduciary of the Company, owed Tesla a duty of loyalty.  Indeed, as a fiduciary, Related was obligated to put Tesla's interests before its own.  Yet, in its quest for more control and wealth, Related brazenly disregarded its obligations.  In or around May 2013, after less than a year as President and head of Tesla's operations in the United States, Related approached Budd with a plan to form a competing curtain wall company.  And in the ensuing months, Related made every effort to induce Budd to leave Tesla and work with Related and its executives to create a company to replace Tesla.  By May 2014, NHF was formed and Budd was employed by Related as Senior Vice President.

6.    But putting Tesla out of business was not enough.  Related also secretly diverted to itself more than $3 million for work Tesla performed for third-party contractors on a Related project.  Related instructed certain employees to submit false certified invoices to the project's general contractor with directions to redirect payment to Related.

7.    Tesla now brings this lawsuit to hold Related and NHF accountable for their roles in Tesla's demise and divest Related and NHF of the profits they wrongfully acquired, including the value of Tesla's confidential information and trade secrets and the millions of dollars in contract amounts owed Tesla that Related simply took for itself.

## PARTIES

8.    Tesla is a limited liability company organized under the laws of the State of Delaware with a principal place of business in Las Vegas, Nevada.

9.    Related is a limited partnership organized under the laws of the State of New York with a principal place of business at 60 Columbus Circle, New York, New York 10023.

10.    NHF is a limited liability company organized under the laws of the State of Delaware with a principal place of business at 60 Columbus Circle, New York, New York 10023.

## JURISDICTION AND VENUE

11.    Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action, as Tesla has pleaded claims under 18 U.S.C. §§ 1831 *et seq.*, the Defend Trade Secrets Act ("DTSA"), and 15 U.S.C. §§ 1051 *et seq.*, the Lanham Act, which give rise to federal question jurisdiction.

12.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over claims asserted under state law that arise from the same nucleus of facts underlying Tesla's claims under the DTSA and Lanham Act.

13.     Related is subject to the personal jurisdiction of this Court because it is a New York limited partnership with its principal place of business in this district.  Because Related is subject to the personal jurisdiction of this Court, it is deemed a resident of this district, thereby making venue proper pursuant to 28 U.S.C. § 1391.

14.     NHF is subject to the personal jurisdiction of this Court because it: (i) maintains headquarters in New York; (ii) has purposefully availed itself of doing business in New York; and (iii) is a division of Related.  Accordingly, NHF is a resident of this district, thereby making venue proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

**Formation of Tesla and Its Partnership with Related**

15.     With over $20 billion in assets, Related is one of the largest and most profitable real estate development and management companies in the world.

16.     Related is in the business of designing, developing, and building large-scale residential and mixed-use buildings.  It has built such notable structures as the Time Warner Center and is currently constructing Hudson Yards, a massive 28-acre, $25 billion development on Manhattan's West Side.

17.     As a global real estate development powerhouse, Related is a major consumer of curtain wall, a type of building façade made of glass and aluminum that presents unique and complex challenges with respect to manufacturing and installation.

18.     Accounting for roughly a fifth of a project's budget, curtain wall is expensive. But the cost of high-end curtain wall, in particular, has rapidly increased in recent years due to high market demand for a product offered by only a handful of companies.  The small number of companies producing high-end curtain wall has also meant long lead-times for delivery, which threatens to delay projects and reduce profit margins.

4

19.     Due to these market conditions, Related was spending large sums of money on curtain wall.  And megaprojects like Hudson Yards, for which curtain wall can cost hundreds of millions of dollars, further exposed Related to escalating curtain wall prices.  In or around 2009, Dr. Carleton Ruthling, the eventual founder and CEO of Tesla, developed a solution for Related.

20.     Dr. Ruthling and Related's relationship dates back to 2004, when they partnered to form Related Supply Ltd. to provide Related with building materials and systems, such as quartzite, glass, and windows, sourced from China, where Dr. Ruthling resided.  While in business, Related Supply saved Related millions of dollars in product costs.

21.     After years of working with Related, Dr. Ruthling was familiar with the market conditions Related faced.  To reduce Related's massive expenditures on curtain wall, Dr. Ruthling developed a business model that integrated a high-end façade company built from the ground up into a large real estate development company like Related.  In or around 2009, Dr. Ruthling approached Related with his concept.

22.     Specifically, Dr. Ruthling devised a model to build from scratch a company to design, manufacture, and install curtain wall and then vertically integrate the company into a real estate development firm.  With this model, complex functions typically performed by three or four separate specialty contractors and consultants were streamlined.

23.     The executives at Related immediately recognized the value of Dr. Ruthling's concept.  First, curtain wall could be delivered at below market prices from a guaranteed supply chain, thereby allowing significant savings (and thus profit) for Related's projects, regardless of size.  Second, the business model would ensure projects were completed on-time or ahead of schedule, as lag times for delivery are alleviated.  And finally, not only would this model increase the developer's profitability by reducing product costs, it would also allow the

developer to profit through co-ownership of the vertically integrated curtain wall company.  In short, Dr. Ruthling proposed a concept whereby a developer like Related could take the hundreds of millions of dollars it budgets for façade costs and pay itself rather than all the middlemen.

24.     The idea was so attractive to Related that Dr. Ruthling, who at that point had never worked in the curtain wall business, met with Related's owners and executives at the highest level, including Chairman and Founder Stephen Ross, Chief Executive Officer Jeff Blau, President Bruce Beal, Executive Vice President and Chief Financial Officer Michael Brenner, Chief Operating Officer Kenneth Wong, and Senior Vice President Michael Loughran.

25.     Following his initial proposal to Related, Dr. Ruthling spent the next several years and invested significant financial resources researching and developing the major components of a high-end curtain wall company, including design, manufacturing, and installation, and the method by which the company would be vertically integrated into Related.  During this time, he refined technical and business processes, acquired key employees in Asia and the Unites States, and assembled suppliers and fabricators in both markets.

26.     By 2011, after starting with nothing but an idea and with no prior experience, Dr. Ruthling developed Tesla, a company capable of designing, manufacturing, and installing curtain wall for Related.

27.     The next step in the development process was to demonstrate the feasibility of vertically integrating Tesla into a real estate development company and the profits that flowed from the integration.  As part of this process, Related agreed to both fund the business and provide Tesla with several large commercial projects.  The parties agreed that after Tesla had established itself through these projects, Related would direct a portion of its façade work, estimated between $1 billion and $2 billion, to Tesla.

28.     Prior to its partnership with Tesla, as is typical for real estate developers in the United States, Related did not design or manufacture building façade systems or purchase such systems at the price point and volume Tesla offered.

29.     To prove its concept, between 2011 and 2012, Tesla began working on a series of high-profile projects for Related, including the Village at Santa Monica, a residential development in Santa Monica, California, and two high-rise buildings in Chicago, Illinois, a 55-story structure located at 500 North Lake Shore Drive and a 65-story structure located at 111 West Wacker Drive (collectively, the "Projects").  These Projects equated to approximately $1 billion in real estate.

30.     While Tesla was working on the Projects, between March and November 2012, Dr. Ruthling and Related's top executives—including Ross, Blau, Beal, Brenner, Wong, and Loughran—were involved in heavy negotiations to formalize the parties' agreement to establish a joint venture.

31.     From the beginning, Related sought majority ownership of Tesla.  Related's executives were unhappy with the prior ownership arrangement with Related Supply, under which Related owned only 30% of the company.  This time around, Related intended to use whatever means necessary to control Tesla.  Related also wanted access to Tesla's confidential information and trade secrets, including Tesla's pricing and methods of sourcing materials from manufacturers and installing curtain wall.

32.     On or around March 3, 2012, in an internal email, Related executives expressed concern that time was running out to negotiate a favorable deal, since after an initial test project in Chicago (500 North Lake Shore Drive), Tesla could "very well not need [Related]" and take its business elsewhere, including Related's competitors.

33. Over the next few months, Related pushed for greater ownership and control of Tesla but was overly aggressive in its demands. Through its venture with Tesla, Related stood to profit from a guaranteed supply chain of curtain wall, faster delivery of the product to its projects, and an enormous reduction in cost of the millions of square feet of curtain wall it required. But Dr. Ruthling held firm, believing it would be inequitable for Related not only to keep 100% of the benefits and savings resulting from Tesla's work but also to take the majority of profits.

34. On July 11, 2012, with no agreement in hand, Related's executives again acknowledged in an internal email the pressing need for a deal, as Tesla had begun to prove the feasibility of its concept. Related's executives recognized that "what Tesla ha[d] managed to accomplish for RLP [was] directly in line with Stephen Ross's objectives in managing supply chain, namely to assist in driving RLP pricing down."

35. Related could have walked away from the deal, having not achieved the terms it wanted. But by this point, Related had seen the benefits of the Tesla model. Moreover, Related wanted ownership in a high-end curtain wall company, particularly in light of the approaching Hudson Yards project, beginning with Building C and the follow-on Building A, which would require in total hundreds of millions of dollars in curtain wall.

36. Related then moved to strong-arm Tesla. On October 2, 2012, in an internal email to the company's top executives, Related's founder and chairman, Stephen Ross, made a prescient threat, vowing to put Tesla out of business if things did not change.

37. But Related's executives knew putting Tesla out of business would not achieve their objectives, as they had no company to replace Tesla and Tesla was providing curtain wall for $1 billion of Related's current projects. And more importantly, breaking with Tesla would

mean losing enormous amounts in savings and profits—a scenario Related was unwilling to entertain.

38.     Unable to achieve their primary objectives, in November 2012, Related's executives changed strategy and threatened to withhold the contract for Hudson Yards Building C from Tesla unless Tesla and Related had a signed deal in place.  As before, Dr. Ruthling was not willing to be bullied and refused to turn over control of Tesla to Related.

39.     By November 27, 2012, Related was out of time and agreed with Dr. Ruthling that Related would have a 25% ownership interest in Tesla going forward.

40.     The parties finalized their agreement on or around November 28, 2012, by way of a term sheet (the "Term Sheet").  Pursuant to the Term Sheet, Related received: (i) a 25% minority interest in Tesla; (ii) the right to approve "Major Decisions" of the Company, defined to include decisions surrounding the hiring and compensation of executives; (iii) the right to refuse to allow Tesla to take on third-party work for two years; and (iv) one of three seats on Tesla's board of directors.

41.     Related initially demanded the Term Sheet include a provision requiring Tesla to provide access to Tesla's confidential information, but Dr. Ruthling refused without written reassurance from Related that it would not disclose or misuse the information.  When Wong, Related's Chief Operating Officer, questioned Dr. Ruthling's stance on Tesla's proprietary information, Loughran, a Senior Vice President, explained:

> What is proprietary is what [Tesla] buys[,] how [Tesla] pays for it, and how [Tesla] deals with the transactions.  The product outflow from China for 500 NLSD has been amazing, we have not had a single hold up (as compared to previous projects). . . .  If auditors look at this, or if Michael Brenner looks at this, it is not being propagated within the industry, so [Tesla's] proprietary methods are kept confidential. . . .  To [Tesla's] point, we need to remind [Tesla] that RLP does not want, or does not care to go into the curtain-wall business, and we do not want to broadcast [Tesla's] pricing to third parties or others since it defeats

Related having a proprietary market advantage.  I think we all get it, [Tesla] just needs to realize we are only looking at this for audit and close out purposes.

42.     To address Dr. Ruthling's concerns, the Term Sheet explicitly provided that information about Tesla's third-party vendors would only be provided to Brenner, Related's Chief Financial Officer, in paper form for temporary review.  Notwithstanding this agreement, Related's executives repeatedly demanded greater access to Tesla's confidential information and trade secrets following execution of the Term Sheet.  But Dr. Ruthling held Related to the agreed-upon terms, refusing to provide the information without the benefit of a binding non-disclosure agreement or other protective measures.

43.     On November 28, 2012, following the signing of the Term Sheet, Related awarded Tesla the curtain wall contract for Building C in excess of $50 million.

44.     In an internal email in or around the same time, Related executives also discussed the expectation that Tesla would be awarded the Hudson Yards Building A contract following Building C.

45.     In or around December 2012, shortly after Related awarded Building C to Tesla, Related and Tesla were notified of a directive by the United States Department of Commerce placing a 400% tariff on Chinese-sourced aluminum, which had the potential to dramatically increase Tesla's prices.  Although the Department of Commerce eventually clarified the scope of the tariff, Related exploited this event to attempt to strike a better deal with Tesla.

46.     First, Related's Projects stopped paying Tesla while Related contested the tariff even though Related asked Tesla to continue delivering product so as not to delay completion of the Projects.  Continued nonpayment by the Projects resulted in a severe cash shortage for Tesla.

47.     Second, Related began to use the Building C contract as leverage to renegotiate the Term Sheet to give Related a greater ownership interest in Tesla.  But Related's ploy

backfired, causing internal conflict with its own project staff.  As part of its construction loan commitments, the Building C project team needed to finalize ("buy out") the curtain wall contract with Tesla.  But in an internal email, Related executives told the project team to hold off on executing the contract because they did not want the Building C contract to provide Dr. Ruthling any leverage in the ongoing negotiations over the ownership of Tesla.

48.     In an internal email dated January 22, 2013, Loughran told the Building C project team:

> So that you are not in the dark, Related and Tesla danced around through the middle of December on their over-all deal, independent of Hudson Yards.  That deal has yet to be papered, and Related wants that deal signed before your deal. We have a term sheet in place, but the "details" always take time.  I don't want your urgency to provide [Dr. Ruthling] with any leverage on our agreement.

As before, Dr. Ruthling remained steadfast that he—not Related—maintain majority ownership of the Company.

49.     Because Tesla refused to capitulate to Related in negotiations, Related rescinded its award of Building C to Tesla on February 7, 2013.  It did so, even as Tesla, at Dr. Ruthling's direction, continued to work on the Projects despite Related's failure to pay.

50.     Related then awarded the Building C curtain wall contract to another curtain wall company, Enclos, at a price that was $18 million more than Tesla's price.

51.     Shortly thereafter, in March 2013, the Department of Commerce clarified the scope of the tariff.  Related as a result came back to Tesla to see if Tesla would agree to a re-award of the Building C contract.  But Related's gamesmanship had wasted too much time— over five months—and Tesla was no longer in a position to meet the delivery schedule for Building C, meaning Related was forced to pay Enclos $18 million it could have saved had it stuck with Tesla.

52.     On April 3, 2013, a Related executive summarized in an internal email the failed attempt to pressure Tesla:

> Look, everything with Related is the chicken and the egg, the big bluff, Blau wanted Carleton to eat the tariff, Carleton didn't flinch, but that Mexican standoff was + - 6 weeks of hell, and Carleton kept going about his business, we hit him up for the % of the bond which came originally from Michael [Brenner], then Ken Wong, that was two weeks, I think the job probably caused a few weeks along the way.  The bottom line, even if there's a corporate relationship, you want to start a job, you sign a contract.  You have payment requirements, the deposits, the cash flow in the original contract, and that is what you move forward with.

53.     After the debacle with Building C, Related learned several key lessons.  First, it was not willing to pay market price for curtain wall on future Hudson Yards buildings.  Second, Tesla could design, manufacture, and install curtain wall at below market price.  Third, Related was never going to own a majority interest in Tesla like it wanted.

54.     With a huge demand for curtain wall in the pipeline, Related had a decision to make.  It could continue with Tesla, or it could part ways with Tesla and either purchase an existing curtain wall company or attempt to develop another company from scratch.

55.     Related ultimately decided to form a new vertically integrated façade company that—unlike Tesla—it could own and control.  It wanted the benefits of its partnership with Tesla but craved greater control and a larger share of the returns.

56.     There was, however, a major problem with Related's ability to part ways with Tesla.  Forming a new company takes time—indeed, it takes years—assuming such a company could be developed at all.  Moreover, Related lacked Tesla's confidential information and trade secrets that Tesla developed over four years.

57.     Given the tight construction schedules for Related's upcoming projects and for Hudson Yards in particular, Related did not know if it was possible to create a new curtain wall company to replace Tesla.  If Related failed, it would be forced to pay market rate for millions of

square feet of curtain wall for its projects, much as it did for Hudson Yards Buildings C and A. This was not a financial outcome Related could sustain and still maintain its projected profits on Hudson Yards.

58.     Faced with this dilemma, Related's executives made a critical—and ultimately illegal—decision to remain business partners with Tesla and continue as a fiduciary of the Company while secretly working to develop a company to replace Tesla.  If the new curtain wall company was developed in time to capture the remaining Hudson Yards jobs, Related could take the future jobs for itself and put Tesla out of business.  If Related failed, however, Tesla would be there to meet Related's product and pricing needs.  Related took great care to keep its scheme under-wraps, fraudulently concealing its illicit acts to ensure Tesla remained unaware of its plans.

**Michael Budd**

59.     It was at this point, in or around May 2013, Related's desires converged with the ambitions of Budd, Tesla's then-President.

60.     While key components of Tesla's team were located in Asia, both Tesla and Related knew Tesla needed to hire an executive in the United States to oversee operations and curtain wall installation.  Dr. Ruthling therefore hired Budd in or around July 2012 because of his reputation in the industry.

61.     Prior to his employment with Tesla, Budd was an executive at Permasteelisa Group, one of the largest curtain wall companies in the world.  He left his position at Permasteelisa to manage the United States operations of a startup curtain wall company because, in part, he believed in Tesla's vision of vertically integrating into Related.

62.     Although Related only had a 25% ownership interest in Tesla, the Term Sheet provided Related significant power to manage Tesla through a provision requiring Related's consent for "Major Decisions."   One of these "Major Decisions" was the hiring of key executives, including Budd, by Tesla.

63.     Accordingly, Related reviewed, redlined, and ultimately approved the terms of Budd's employment agreement (the "Employment Agreement" or "Agreement").

64.     On or around July 2, 2012, Budd executed the Agreement.  Tesla hired Budd to serve initially as a consultant for the Company for a period of six months, after which he became the Company's President.  Budd was responsible for all of Tesla's United States operations, including developing new business and sales in the United States and managing the installation of Tesla products for projects in the United States.

65.     Budd's Employment Agreement contained several key provisions, including confidentiality, non-interference, and non-solicitation clauses.

66.     The Agreement explicitly provided that Budd "ha[s] had, and will continue to have, access to Confidential Information."   Budd admitted under oath at trial in *Tesla Wall Systems, LLC v. Budd* that he had access to such information during his tenure as President.

67.     The Agreement defined "Confidential Information" as "any and all confidential and/or propriety knowledge, data or information of the Company," including, but not limited to:

> tangible and intangible information relating to the Company's design and engineering of curtain walls, . . . the Company's preparation, design, and construction and installation of curtain walls, . . . the Company's preparation, design, construction and installation of the skin of a building, the composition of materials used in the curtain walls, formulations, products, processes, know-how, design formulas, methods, developmental or experimental work, clinical data, technical data, improvements, discoveries, plans for research, new products, marketing and selling, bids, bidding strategy, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers, as well as the customers' business needs, the composition, design,

manufacture, products, sale, purchase, bidding, promotion, application or use of any and all products, materials, systems, concepts or services in any way related to or useful in the business of the Company.

68.     The Agreement provided that Budd could not: (i) use Confidential Information except to benefit Tesla in the performance of his duties as President of the Company; (ii) disclose Confidential Information except to benefit Tesla and only to individuals authorized by Tesla to receive such information; or (iii) "copy, abstract, summarize or precis any documents, material or record that contain[ed] or refer[red] to the Confidential Information or the Company's property, unless it [was] for the benefit of the Company and [was] necessary in [Budd's] fulfilment of [his] employment duties and responsibilities."

69.     The Agreement also prohibited Budd from competing with Tesla:

During [Budd's] employment by the Company, except on behalf of the Company, [Budd will] not directly or indirectly serve as an officer, director, stockholder, employee, partner, proprietor, investor, joint venturer, associate, representative or consultant of any other person, corporation, firm, partnership or other entity whatsoever known by [Budd] to compete with the Company (or is planning or preparing to compete with the Company), anywhere in the world, in any line of business engaged in (or planned to be engaged in) by the Company.

70.     The Agreement also provided that in the event Budd resigned from Tesla without good reason—which was limited to (i) a substantial and material reduction in the nature or scope of Budd's duties without his consent, (ii) a reduction in his annual salary or failure to continue participation in any incentive or benefit plan, (iii) a permanent relocation of Budd's position to a location more than fifty miles from his previous location without his consent, or (iv) a material breach by Tesla of a provision of the Agreement that remained uncorrected for thirty days after Budd notified the Company of the breach in writing—or was terminated for cause, he would not interfere with Tesla's business for a period of six months after his resignation or termination.

71.     In such a case, *i.e.*, if Budd resigned from Tesla without good reason or was terminated for cause, the Agreement also prohibited Budd from "employ[ing] or attempt[ing] to

employ (by soliciting or assisting anyone else in the solicitation of) any employee of the Company on behalf of any other entity, whether or not such entity competes with the Company," for a period of nine months after his resignation or termination.

72.     As Related participated in the drafting of Budd's Employment Agreement, it was aware of these confidentiality, non-interference, and non-solicitation provisions.

**Related's Collusion with Budd**

73.     Unbeknownst to Tesla, beginning in or around July 2013, Related began a concerted campaign to induce Budd to leave his position as Tesla's President to work for Related and help form a competing curtain wall company that would serve a virtually identical function to Tesla—*i.e.*, the company would be vertically integrated into Related and would design, manufacture, and install curtain wall at reduced costs for Related projects—but that would be controlled and majority-owned by Related.  This replacement curtain wall company eventually became NHF.

74.     Related was still involved in a strategic partnership with Tesla in July 2013, and Tesla was wholly unaware of Related's actions in inducing Budd to breach his Agreement with Tesla and form a replacement curtain wall company predicated on Tesla's confidential information and trade secrets.

75.     Through a series of secret meetings in which Budd met with high-level Related executives, including Ross, Blau, Beal, Wong, and Brenner, Related decided to hire Budd to serve as a key executive of the replacement curtain wall company.

76.     In or around July 2013, Loughran, a Senior Vice President of Related, went to see Budd at a Project site in Chicago "to sense how '[h]e [was] reading the tea leaves'" because, by

this point, Related was contemplating "bringing him in."  Budd continued speaking and meeting with Related executives through the end of 2013.

77.     In fact, Brenner, Related's Chief Financial Officer, coordinated a meeting with Budd on or around September 17, 2013.  Around that same time, Related's highest-level executives, including Ross, Beal, Brenner, and Wong, organized an internal meeting to "[d]iscuss Michael Budd."

78.     Then, on or around October 3, 2013, Budd met with several high-level executives, including Ross, Blau, Beal, and Brenner, in Ross's office at Related.

79.     The next day, on or around October 4, 2013, Loughran sent Budd a pipeline of Related projects totaling approximately $450 million.  Despite his position as President of Tesla, Budd did not share this pipeline with Tesla or Dr. Ruthling.  Nor did Related, who also owed Tesla a duty of loyalty.

80.     On that same day, Budd sent his Employment Agreement to Brenner for review and to determine how Budd could possibly evade his contractual obligations to Tesla.

81.     A few days later, on or around October 15, 2013, Brenner internally suggested "an orderly wind down of Tesla" to Ross, Blau, Beal, Wong, and Loughran, to which Ross responded, "We should finalize a deal with Budd first if possible."

82.     On or around December 3, 2013, Budd emailed Loughran to "firm[] up which day(s) would be best to meet" in New York.  Budd requested that Related purchase his plane ticket to New York since he had "no official business reason to travel there on behalf of Tesla" and did "not want to raise any red flags at this point."  Brenner and Loughran instructed Budd to purchase his own plane ticket, after which Related would reimburse him.  Related later reimbursed Budd for his travel expenses for this trip and others.

83.     A few days later, on or around December 11, 2013, Budd met with Beal, Related's President.

84.     On or around December 13, 2013, Budd distributed Tesla's business plan and financials to a Related executive without Tesla's knowledge or permission.

85.     Without notifying Tesla, Budd then traveled to New York for additional meetings with Related executives in January and February 2014 to discuss potential projects for NHF, including upcoming Hudson Yards jobs.  Budd also submitted expense reports to Related for his travel expenses.  Related reimbursed Budd for those trips.

86.     On March 7, 2014, Related sent Budd a written offer of employment.

87.     The next day, on March 8, 2014, Budd tendered his resignation to Tesla, effective May 8, 2014.  Pursuant to the Agreement, Budd remained President of Tesla during this sixty-day period.

88.     During this sixty-day period, Related continued secretly meeting with Budd to further its plan to establish a competing curtain wall company to replace Tesla.  Budd even discussed the name of the new company with Related's executives, discouraging them from using "Hudson" in the new company's name, as Dr. Ruthling already had a façade company, Hudson Walls LLC, named after his daughter, Hudson.

89.     While still President of Tesla, Budd traveled to Italy with Related executives to meet with potential joint venture partners and suppliers for the competing curtain wall company without ever disclosing the trips to Tesla.  Related again paid Budd for his expenses.

90.     At Related's request, Budd also traveled to Philadelphia while still President of Tesla to scout potential sites for manufacturing facilities for the competing curtain wall company without disclosing the trips to Tesla.

91.     During his deposition in connection with Tesla's lawsuit against him, Budd testified that he helped establish NHF "[a]fter hours" while he was President of Tesla, despite the provisions in his Agreement requiring him to use all efforts for the benefit of Tesla and prohibiting him from competing with the Company at any time.

92.     After Budd's resignation from Tesla became effective, Budd served as a Senior Vice President of Related before moving to NHF.

93.     Related and Budd continued colluding to form NHF and get the company up and running during Budd's six-month non-interference period, which expired on November 8, 2014.

94.     Upon information and belief, Budd, at Related's request, solicited, directly or indirectly, all Tesla's employees in the United States, including Sean Murphy, Denise DeLuca, and Tim Paulson, to work for Related and/or NHF in violation of the non-solicitation provision in Budd's Agreement with Tesla, which did not expire until February 8, 2015.

95.     In addition, despite its knowledge of Budd's contractual obligations to Tesla and its own fiduciary duties to Tesla, Related induced Budd to violate his Agreement by misappropriating Tesla's trade secrets and sharing such information with Related to enable the formation of NHF.

96.     Related induced Budd to leave Tesla and breach his obligations under the Agreement by, among other things: (i) negotiating Budd's ownership interest in the competing curtain wall company; (ii) requesting and receiving Tesla's confidential information and trade secrets; (iii) offering Budd employment that would require him to use his knowledge of Tesla's confidential information and trade secrets; and (iv) paying for Budd to travel to New York, Italy, and Pennsylvania so he could play a central role in the creation of the competing curtain wall company even though he was still President of Tesla.

97.     Through its actions, Related tortiously interfered with Budd's obligations under the Agreement, as well as Budd's employment with Tesla, and breached its fiduciary duties to Tesla as Tesla's joint venture partner.

98.     Related knew its actions in colluding with Budd to form a competing curtain wall company while Budd was still President of Tesla and encouraging Budd to leave Tesla and transmit Tesla's confidential information and trade secrets to Related were wrongful.   Related accordingly went to great lengths to cover its tracks, fraudulently concealing its illicit acts to ensure Tesla remained blamelessly unaware of its plans.

99.     During the entire period of NHF's formation and Related's duplicity, Tesla was wholly unaware that Related, its joint venture partner and fiduciary, had: (i) misappropriated Tesla's trade secrets; (ii) colluded with Tesla's President to obtain and use Tesla's trade secrets; and (iii) formed a competing company using Tesla's confidential information and trade secrets.

100.     As Related colluded with Budd to form a competing curtain wall company, it continued to work with Tesla to identify solutions for implementing the Company's vision. Related kept the relationship going, in part, because it needed Tesla to complete its existing Projects.  Moreover, Related needed Tesla fully operational in case the new company it sought to form with Budd was not in a position to take on the upcoming Hudson Yards buildings.

101.     Related could have terminated its venture with Tesla and hired Budd after the expiration of his six-month non-interference period.  But Related hedged its bets.  It needed Tesla's confidential information and trade secrets immediately—not in six months—if the new company was to achieve operational status in time to take on Hudson Yards.  Related therefore needed Budd but also needed Tesla as a backup, as evidenced by Ross's insistence that Related finalize a deal with Budd before cutting ties with Tesla.

102.    When Related finally expressed its alleged dissatisfaction with Tesla's performance, it indicated it was no longer interested in curtain wall manufacturing or doing business with Tesla.  These representations were made while Related secretly worked with Budd to duplicate Tesla's business model and form NHF so that NHF could obtain curtain wall contracts that would have otherwise gone to Tesla.

**NHF and Defendants' Misappropriation of Tesla's Trade Secrets**

103.    Related worked diligently to create NHF so that NHF, rather than Tesla, would be awarded the huge pipeline of projects Related initially promised Tesla pursuant to their partnership.

104.    Related executives worked with Budd and other partners in the NHF venture to source curtain wall suppliers and factory equipment, establish strategic relationships with curtain wall vendors, visit manufacturers, explore potential locations for manufacturing facilities in the United States, obtain funding, examine whether tax credits or other government aid could be obtained, and recruit employees.  NHF received approximately $11.4 million in startup funding from Related and another $4.9 million from the Commonwealth of Pennsylvania in the form of tax credits, grants, and development loan programs.

105.    NHF was incorporated on or around May 5, 2014, three days before Budd's resignation from Tesla became effective.

106.    But Related needed NHF fully operational with Budd at the helm before the remaining Hudson Yards contracts came up for bid.  And for NHF to be in a position to take on these projects, Defendants had to use Tesla's confidential information and trade secrets.

107.    Tesla's trade secrets consist of the business design and data demonstrating the feasibility, reliability, and cost of building a curtain wall company from the ground up and

vertically integrating it into a real estate development company to design, manufacture, and install high-end curtain wall, as well as the process Tesla underwent to implement that concept, which took years and a substantial investment of resources to develop.

108.    Tesla's trade secrets include information related to its operating practices and methods, including pricing and billing methods, financing, business plans, and data concerning the strengths and weaknesses of the business model and operations.

109.    Tesla's trade secrets also include technical data, internal pricing information, cost information, business methods and systems, research, engineering designs, product plans, products, services, vendor lists, markets, software, inventions, marketing, finances, and other information related to Tesla's business model for the design, manufacture, and installation of building façade systems, along with the vertical integration of such a business into a real estate development company.

110.    Tesla took reasonable efforts to maintain the secrecy of its trade secrets, including by refusing to disclose such information to Related without proper protections and nondisclosure agreements in place and by including confidentiality provisions in Budd's Employment Agreement.

111.    Defendants possessed certain components of Tesla's trade secrets by virtue of Related's partnership with Tesla, but Related was prohibited from using such information by its status as a fiduciary of Tesla.  Defendants were not directly privy to certain aspects of Tesla's trade secrets but rather received such information from Budd.  Indeed, upon information and belief, Defendants rewarded Budd for his integral role in enabling them to misappropriate Tesla's trade secrets by giving him a 10% ownership interest in NHF.

112.    No other entity or individual could discover Tesla's trade secrets without the same expenditure of time and resources and without undergoing the same process of creating a curtain wall company from the ground up and vertically integrating that company into a real estate developer.

113.    Using Tesla's trade secret information, NHF was able to vertically integrate into Related and is nearly identical to Tesla in the façade services it provides and has the same sole customer (*i.e.*, Related) and project pipeline (*i.e.*, the Hudson Yards jobs).   But unlike Tesla, NHF is controlled and majority-owned by Related.   Related was able to obtain the control over and ownership interest in NHF that it could never obtain in Tesla despite repeated attempts to do so.   Budd is currently an executive of NHF and owns a minority interest in the company.

114.    Defendants modeled NHF's business plan on Tesla's business plan.   In fact, certain sections of NHF's business plan were copied directly from the Tesla business plan Budd provided to Related.

115.    Without the information misappropriated from Tesla, Related would not have been able to create NHF in time to award it the curtain wall contracts for the remaining Hudson Yards buildings.   NHF, in turn, would not have become a highly valuable and profitable vertically integrated curtain wall company had it not relied on and used Tesla's trade secrets to its own advantage.

116.    Upon information and belief, through the use of Tesla's unique innovation, Related has captured profits that would have been impossible to realize had Related adhered to the traditional model of installing curtain wall—*i.e.*, contracting with an independent curtain wall company to manufacture and install the building façade.

117.    In fact, Tesla now knows that NHF was provided access to the project pipeline that Related promised Tesla pursuant to the agreement between the parties. Upon information and belief, NHF has already been awarded hundreds of millions of dollars in contracts from the pipeline.

118.    The partnership between Tesla and Related was structured to ensure that both parties benefitted from the implementation of an innovative way to design, manufacture, and install curtain wall.  Instead, Tesla saw its vision and the trade secrets developed stolen by Defendants.  Rather than realize the promised profits and opportunities, Tesla saw its business destroyed as Defendants prospered, in large part, due to their theft of Tesla's trade secrets.

**Temporal Relationship of Defendants' Wrongful Acts**

119.    With the benefit of discovery in prior related actions, the following timeline is a succinct summary of Defendants' scheme to destroy Tesla and form a competing curtain wall company.  The temporal connection between these events is helpful in understanding Related's overall scheme and demonstrates that any claim of innocence by Related is disingenuous.

- Between July 2013 and December 2013, Related and Budd engaged in numerous secretive communications and meetings to set in motion Tesla's demise and the formation of a competing curtain wall company.

- These secret meetings culminated in Budd sending Related a copy of Tesla's business plan in December 2013.

- With Tesla's business plan in hand, Related developed a nearly identical business plan for the competing company, in numerous instances, copying Tesla's own plan verbatim.

- During the first week of March 2014, while still employed as Tesla's President, Budd secretly travelled to Italy, at Related's request, to meet with potential joint venture partners.  Related was fully aware that its conduct was a breach of its own fiduciary duties to Tesla, as well as a violation of Budd's fiduciary and contractual obligations.

- Mere days after returning from Italy, on or around March 7, 2014, Budd received an offer of employment from Related.

- On March 8, 2014, the day after Budd received an offer of employment from Related, Budd submitted his resignation to Tesla, which did not take effect until May 8, 2014.

- During the short sixty day window between when Budd tendered his resignation and the date the resignation became effective, Related and Budd continued breaching their respective fiduciary and contractual duties to Tesla by: (1) formally incorporating NHF; (2) conducting business meetings on behalf of NHF; and (3) procuring millions of dollars in investments on behalf of NHF.

- Shortly after Budd's resignation became effective, in or around July 2014, Related named NHF as the fabricator on four of its projects.  These diverted projects, which rightfully belonged to Tesla, were a milestone for Related in its effort to steal Tesla's trade secrets and form a competing business.

120.    Defendants' misappropriation of Tesla's trade secrets is ongoing.  They continue using Tesla's trade secrets to obtain business as a direct result of their misappropriation.

121.    Despite Tesla's repeated demands that Defendants cease their use of its trade secrets, Defendants have refused to do so.  Instead, Defendants have: (i) misappropriated Tesla's trade secrets; (ii) used Tesla's trade secrets to create a competing venture; (iii) colluded with Tesla's former President to steal Tesla's confidential information and trade secrets; and (iv) reaped and continue to reap rewards from their misappropriation of Tesla's trade secrets.

**Related's Diversion of Over $3 Million in Contract Funds Owed Tesla**

122.    In addition to destroying Tesla and stealing the Company's trade secrets and business opportunities, Related illegally diverted to itself approximately $3.3 million in contract funds owed Tesla for work done on the 111 W. Wacker project.

123.    Tesla and the general contractor for the 111 W. Wacker project entered into a contract for the provision of curtain wall.  While under oath, Brenner, Related's Chief Financial Officer, testified that Related did not have a similar contract directly with the general contractor.

25

124.    Related understood it had no authority to bill the 111 W. Wacker project on Tesla's behalf.  And, Dr. Ruthling instructed Related not to submit payment to the 111 W. Wacker project without his prior written approval.

125.    Nevertheless, in or around April 2014, Related employee Jennifer Ferraro began communicating with various parties, including the general contractor for the 111 W. Wacker project, to obtain direct payment for funds owed Tesla.  Tesla had no knowledge of Ferraro's efforts.

126.    Ferraro's initial efforts were unsuccessful.  She determined on or around April 29, 2014 that Related would not be able to obtain payment for the 111 W. Wacker project unless Tesla provided a reimbursement letter, signed by an authorized party, stating that funds can be disbursed to Related.

127.    In an email dated May 1, 2014, Ferraro pressured Dr. Ruthling to provide the necessary authorization on Tesla's behalf, but Dr. Ruthling refused to do so.

128.    In turn, Related devised a scheme to obtain the funds in question through fraudulent means.  As an initial step, Loughran, a Related Senior Vice President, contacted the general contractor for the 111 W. Wacker project on or around June 24, 2014 to determine the circumstances pursuant to which the general contractor would make payment to Related without authorization from Tesla.  In a response dated July 1, 2014, the general contractor requested, *inter alia*, that Related provide an executed power of attorney showing Related had the authority to bill on behalf of Tesla, and moreover, that Related indemnify the contractor for any claims Tesla ultimately might bring.  Related therefore understood that receiving any funds owed Tesla under the 111 W. Wacker contract would be improper and would likely result in litigation.

129.    Upon information and belief, when Related was unable to come to a mutually agreeable resolution with the general contractor, it devised a more disturbing scheme.

130.    On multiple dates between mid-2014 and early 2015, Related and former Tesla employees working for Related, including Murphy and Deluca, falsely negotiated and submitted payment applications, change orders, and final billings—purporting to be on behalf of Tesla—to the general contractor for the 111 W. Wacker project without Tesla's knowledge or consent.

131.    Specifically, upon information and belief, Related executives directed former Tesla employees working for Related, including Murphy and Deluca, to create one or more false payment applications on behalf of Tesla and to submit those false applications to the general contractor for the 111 W. Wacker project with the intent that the contractor incorrectly believe the applications to be true and correct and thereby pay Related contract sums owed Tesla.

132.    Upon information and belief, to facilitate this diversion of funds, Related directed Murphy and Deluca to use their Tesla login information to enter Tesla's billing portal for the 111 W. Wacker project without Tesla's knowledge or consent.

133.    For example, on or around June 2, 2014, June 24, 2014, and January 16, 2015, Murphy submitted applications for payment on Tesla's behalf, without Tesla's prior authorization, through the billing portal for the 111 W. Wacker Project.  Murphy signed each application as Tesla' Project Manager.  Notably, Murphy ended his employment with Tesla on June 30, 2014.

134.    Deluca fraudulently notarized each payment application with full knowledge that both she and Murphy were no longer Tesla employees.

135.    Murphy, on behalf of Related, also negotiated Tesla's final billings directly with the general contractor for the 111 W. Wacker project without Tesla's knowledge or consent. This conduct occurred in or around early February 2015.

136.    As a result of Related's material and fraudulent misrepresentations, the general contractor for the 111 W. Wacker project paid Related approximately $3.3 million in contract proceeds owed Tesla.

137.    When asked how Related obtained payment from the general contractor for the 111 W. Wacker project when Tesla, not Related, was the party to the relevant contract, Brenner, Related's Chief Financial Officer, testified that he did not know and that "[t]here were a bunch of lawyers involved."

138.    Brenner further testified that he is unaware of any document that would provide Related with the authority to bill on Tesla's behalf and, in fact, no such document exists.

139.    Upon the facts alleged herein, this Complaint sets forth causes of action for: (i) violation of the Defense of Trade Secrets Act; (ii) unfair competition; (iii) violation of the Lanham Act, 15 U.S.C. § 1125; (iv) tortious interference with contract; (v) breach of fiduciary duty; (vi) aiding and abetting breach of fiduciary duty; (vii) breach of the covenant of good faith and fair dealing; (viii) fraud; and (ix) unjust enrichment.

### <u>COUNT I</u>
**Federal Misappropriation of Trade Secrets under DTSA**
**(Against All Defendants)**

140.    Tesla realleges and incorporates by reference herein the allegations set forth in Paragraphs 15-139 above.

141.    Defendants' actions, as set forth herein, constitute misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1839 *et seq.*

142. Defendants possessed Tesla's trade secrets by virtue of Related's strategic partnership with Tesla and through Related's hiring of Budd, Tesla's former President, to form NHF, a company created to compete with Tesla by using Tesla's innovative trade secrets.

143. Tesla's trade secrets were developed and used in interstate and foreign commerce.

144. Tesla's trade secrets consist of its concept and operational experience of vertically integrating a high-end curtain wall company into a real estate development company to design, manufacture, and install curtain wall and the processes Tesla developed to implement that concept, which took years and a substantial investment of resources. Tesla proved the feasibility of creating and vertically integrating a high-end façade company into a real estate developer, allowing direct collaboration between the façade company and the developer and architect, thereby streamlining the construction process, eliminating costly middlemen contracts, and allowing faster completion of projects. Tesla's resulting trade secrets include technical data, internal pricing information, work product, research, engineering designs, product plans, products, services, vendor lists, markets, software, inventions, marketing, finances, and other information related to Tesla's business model for the design, manufacture, and installation of building façade systems, along with the vertical integration of such a business into a real estate development company.

145. Tesla's trade secrets derive independent economic value from not being generally known and not being readily ascertainable through proper means by others, as such information is extremely valuable to Tesla and constitutes information that is not widely known in the industry due to its unique nature and Tesla's reasonable efforts to maintain its secrecy.

146.     Tesla incorporated confidentiality provisions into its Agreement with Budd, which prohibited the unauthorized use or disclosure of Tesla's confidential information and required Budd to return any and all confidential information upon his resignation from Tesla.

147.     Additionally, Tesla repeatedly insisted that Related maintain the confidentiality of the information it learned through its partnership with Tesla.

148.     Defendants knew or had reason to know that Related, as Tesla's partner, and Budd, as Tesla's former President, were privy to and under an obligation not to use or disclose Tesla's trade secrets.

149.     Defendants knowingly and improperly obtained, used, and disclosed such trade secrets in violation of DTSA and relevant common law and statutory provisions prohibiting profiting from another's trade secret.

150.     Defendants have continued to use Tesla's trade secrets to ensure that NHF maintains its competitive advantage.  Accordingly, there is no doubt that Defendants' illicit use and misappropriation of Tesla's trade secrets post-date the May 11, 2016 enactment of DTSA.

151.     Defendants' conduct constitutes knowing, willful, and malicious misappropriation.

152.     As a result of Defendants' misappropriation of Tesla's trade secrets, Tesla has suffered and will continue to suffer damages in an amount to be determined at trial.

153.     As a consequence of Defendants' willful and malicious misappropriation of Tesla's trade secrets, Defendants are liable for exemplary damages and reasonable attorney's fees.

**COUNT II**
**Unfair Competition**
**(Against All Defendants)**

154.    Tesla realleges and incorporates by reference herein the allegations set forth in Paragraphs 15-139 above.

155.    The actions of Defendants, as set forth herein, constitute unfair competition.

156.    Defendants misappropriated Tesla's confidential information and trade secrets by obtaining access to such information through fraud or deception and/or the abuse of a confidential relationship.

157.    Defendants' actions resulted in the destruction of Tesla's business.

158.    As a result of Defendants' actions, Tesla suffered direct and consequential damages, including actual economic harm to its business, and is entitled to recover compensatory damages, including punitive damages, in an amount to be determined at trial.

**COUNT III**
**Violation of the Lanham Act, 15 U.S.C. § 1125**
**(Against Related)**

159.    Tesla realleges and incorporates by reference herein the allegations set forth in Paragraphs 15-139 above.

160.    Related made false and misleading statements in interstate commerce and in connection with goods or service in commercial advertising or promotion in violation of the Lanham Act, 15 U.S.C. § 1125(a).

161.    Related materially misrepresented Tesla's status, goods, services, and/or commercial activities to the consumers of Tesla's products and services by submitting falsely certified payment applications.

162.    Tesla has been, and is likely to continue to be, damaged by these acts.

163.     Through its continued false and misleading communications with Tesla's consumers, Related has succeeded in influencing payment decisions, diverting funds from Tesla, and curtailing Tesla's ability to serve its customers.

164.     Related's false representations confused and deceived consumers concerning the characteristics of products and services offered by Tesla in interstate commerce in violation of the Lanham Act, 15 U.S.C. § 1125(a).

### COUNT IV
### Tortious Interference with Contract
### (Against Related)

165.     Tesla realleges and incorporates by reference herein the allegations set forth in Paragraphs 15-139 above.

166.     The Agreement was a valid contract between Budd and Tesla.  As Tesla's partner, Related had knowledge of the Agreement and the specific provisions prohibiting Budd from using and disclosing Tesla's confidential and trade secret information.

167.     Related reviewed and commented on the Agreement at the time of its execution and then reviewed the Agreement again on or around October 4, 2013.

168.     Although Budd was an at-will employee of Tesla under the Agreement, Related is liable for Budd's resignation from Tesla because Related used tortious means to cause Budd to resign.  Specifically, Related violated its fiduciary duty to Tesla by inducing Budd to resign.

169.     Additionally, Related intentionally and improperly caused Budd to breach his obligations under the Agreement.  Related sought to secure a competitive advantage over Tesla through Budd's breaches of his obligations under the Agreement not to use or disclose Tesla's confidential information and trade secrets.

170.     Upon information and belief, Related has, in fact, used the information it learned from Budd both to create and now operate NHF.

171.     Budd would not have breached his obligations under the Agreement or resigned from Tesla but for Related's actions in inducing Budd to use and disclose Tesla's confidential information and trade secrets.

172.     As a proximate result of Related's tortious interference with the Agreement, Tesla has been damaged and continues to be damaged in an amount to be determined at trial.

**<u>COUNT V</u>**
**Breach of Fiduciary Duty**
**(Against Related)**

173.     Tesla realleges and incorporates by reference herein the allegations set forth in Paragraphs 15-139 above.

174.     Related referred to itself as Tesla's partner—not only to Tesla but also to the Department of Commerce and members of Congress in response to the tariff—and also exercised a management role in Tesla's affairs.

175.     In addition to the common law fiduciary duties Related owed Tesla as Tesla's partner, Related also owed Tesla fiduciary duties as a result of its status as a managing member of Tesla.

176.     Pursuant to §§ 18-1101(c) and 18-1104 of the Delaware Limited Liability Act, managers of limited liability companies owe fiduciary duties to their limited liability companies and their members.  Consequently, as a manager of Tesla, Related was a fiduciary bound to act in good faith, with honesty in fact and utmost loyalty, and in the best interests of Tesla.

177.    Related breached its fiduciary duties to Tesla by, among other things: (i) disclosing and/or using Tesla's confidential information and trade secrets for its own benefit; (ii) using Tesla's property; (iii) planning, forming, purchasing, staffing, and operating a building façade company to compete with Tesla; (iv) interfering with Tesla's current and prospective business relationships; and (v) colluding with Tesla's then-President to form a competing company without disclosing such information to Tesla.

178.    As a proximate result of Related's breaches of its fiduciary duties, Tesla has been damaged and continues to be damaged in an amount to be determined at trial.

**COUNT VI**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against Related)**

179.    Tesla realleges and incorporates by reference herein the allegations set forth in Paragraphs 15-139 above.

180.    As Tesla's President, Budd was a fiduciary to Tesla.  Budd owed Tesla fiduciary duties to act in good faith and in Tesla's best interests.

181.    Budd breached his fiduciary duties to Tesla by, *inter alia*, secretly forming a company with Related for purposes of competing with Tesla, soliciting Tesla's customers, and diverting business from Tesla.

182.    Related knowingly induced Budd to breach his fiduciary duties to Tesla in favor of serving a central role in the formation of a competing curtain wall company that would replace Tesla.

183.    Related knowingly induced Budd to breach his fiduciary duties to Tesla by misappropriating Tesla's trade secrets and sharing such information with Related to enable the formation of the competing curtain wall company.

184.    Upon information and belief, Related also had Budd solicit, directly or indirectly, all Tesla's employees in the United States, including Murphy, DeLuca, and Paulson, to work for Related and/or NHF in violation of Budd's fiduciary duties to Tesla.

185.    Related knew its actions in inducing Budd to breach his fiduciary duties and form a competing curtain wall company while Budd was still President of Tesla and encouraging Budd to leave Tesla and transmit Tesla's confidential information and trade secrets to Related were wrongful.

186.    During the entire period of Related's and Budd's duplicity and NHF's formation, Tesla was wholly unaware that Related was inducing Budd to breach his fiduciary duties to Tesla and working to form a competing company using Tesla's confidential information and trade secrets.  As Related colluded with Budd, it continued to work with Tesla, actively concealing its collusion with Budd and misleading Tesla by continuing to work with the Company and identify solutions for implementing Tesla's vision.  Related misled Tesla to keep the relationship going, in part, because it needed Tesla to complete its existing Projects.  Moreover, Related needed Tesla fully operational in case NHF was not in a position to take on the Hudson Yards buildings.

187.    As a proximate result of Related's actions in aiding and abetting Budd's breach of his fiduciary duties to Tesla, Tesla has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT VII
### Breach of the Covenant of Good Faith and Fair Dealing
### (Against Related)

188.    Tesla realleges and incorporates by reference herein the allegations set forth in Paragraphs 15-139 above.

189.    Related entered into a joint venture with Tesla through which it owed Tesla a fiduciary duty not to take actions inimical to Tesla's interests.

190.    Related's fiduciary duty to Tesla encompassed its duty to act in good faith and fair dealing in its interactions with Tesla.

191.    Notwithstanding its obligations of good faith and fair dealing, Related deceived Tesla by, among other things, surreptitiously misappropriating and using Tesla's trade secrets to create a competing company.

192.    These actions prevented Tesla from obtaining projects that Related had promised Tesla pursuant to their strategic partnership.

193.    As a proximate result of Related's breaches of the covenant of good faith and fair dealing, Tesla has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT VIII
### Fraud
### (Against Related)

194.    Tesla realleges and incorporates by reference herein the allegations set forth in Paragraphs 15-139 above.

195.    Tesla entered into a written agreement with the general contractor of the 111 W. Wacker project for the provision of curtain wall.

196.    Related was not a party to the contract between Tesla and the general contractor and did not have the authority to request payment on Tesla's behalf.  In fact, Related, through its executives, acknowledged it is unaware of any document that would provide Related with the authority to bill on Tesla's behalf for the 111 W. Wacker project.

197.     Related made multiple misrepresentations of fact to fraudulently induce the general contractor of the 111 W. Wacker project to pay Related sums owed Tesla.

198.     Specifically, on multiple dates in or around January and February 2015, Related and former Tesla employees working for Related falsely negotiated and submitted payment applications, change orders, and final billings—purporting to be on behalf of Tesla—to the general contractor for the 111 W. Wacker project without Tesla's knowledge or consent.

199.     Upon information and belief, to facilitate this diversion of funds, Related directed former Tesla employees working for Related to use their Tesla login information to enter Tesla's billing portal for the 111 W. Wacker project without Tesla's knowledge or consent.

200.     Related also negotiated Tesla's final billings directly with the general contractor for the 111 W. Wacker project without Tesla's knowledge or consent.

201.     Related made these representations with full knowledge of their falsity to induce the general contractor to pay Related sums rightfully owed Tesla.

202.     As a result of Related's material and fraudulent misrepresentations, the general contractor for the 111 W. Wacker project paid Related approximately $3.3 million in contract proceeds owed Tesla.

203.     The general contractor reasonably relied on these representations and had no reason to know of their falsity, particularly given that Related, with the assistance of former Tesla employees, requested payment by unlawfully accessing Tesla's billing portal for the 111 W. Wacker project.

204.     As a direct result of Related's fraudulent misrepresentations, the general contractor on the 111 W. Wacker project paid Related $3.3 million owed Tesla.

## COUNT IX
## Unjust Enrichment
## (Against Related in the Alternative to Fraud)

205.    Tesla realleges and incorporates by reference herein the allegations set forth in Paragraphs 15-139 above.

206.    Tesla entered into a written agreement with the general contractor of the 111 W. Wacker project for the provision of curtain wall services.  Related was not a party to that contract and had no authority to bill on Tesla's behalf.

207.    Although it lacked the authority to do so, Related requested payment from the general contractor of the 111 W. Wacker project for sums owed Tesla.

208.    As a result of Related's misrepresentations, the general contractor for the 111 W. Wacker project paid Related approximately $3.3 million in contract proceeds that rightfully belong to Tesla.

209.    Related was unjustly enriched at Tesla's expense.

210.    It is against equity and good conscience to permit Related to retain the $3.3 million that rightfully belongs to Tesla.  The Court should therefore disgorge Related of those funds.


## PRAYER FOR RELIEF

WHEREFORE, Tesla prays for judgment with respect to its Complaint as follows:

A.    With respect to Counts I-VIII, granting compensatory and all other damages allowed by law;

B.    With respect to Count I (Federal Misappropriation of Trade Secrets), granting Tesla exemplary damages and attorney's fees pursuant to 18 U.S.C. § 1836;

C.      With respect to Counts IV (Tortious Inference with Contract), V (Breach of Fiduciary Duty), VI (Aiding and Abetting Breach of Fiduciary Duty), and VIII (Fraud), granting punitive damages;

D.      With respect to Count IX (Unjust Enrichment), disgorging Related of the approximately $3.3 million that belongs to Tesla; and

E.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Tesla demands a trial by jury on all issues so triable.


Dated: New York, New York
       August 7, 2017

                      Respectfully Submitted,

                      **EVERSHEDS SUTHERLAND**

                      /s/ Lawrence A. Dany III
                      Ronald W. Zdrojeski
                      Lawrence A. Dany III
                      1114 Avenue of the Americas, 40th Floor
                      New York, New York 10036
                      (212) 389-5000

                      *Attorneys for Plaintiff Tesla Wall Systems, LLC*