USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
TESLA WALL SYSTEMS, LLC,          :
                                  :     17-cv-5966
          Plaintiff,              :
                                  :     OPINION AND ORDER
     -v-                          :
                                  :
RELATED COMPANIES, L.P. and NEW   :
HUDSON FACADES LLC,               :
                                  :
          Defendants.             :
----------------------------------x

JED S. RAKOFF, U.S.D.J.

     Before the Court is the motion of defendants The Related
Companies, L.P. ("Related") and New Hudson Facades LLC ("NHF") for
summary judgment as to four claims in a suit filed by plaintiff
Tesla Wall Systems LLC ("Tesla") on August 7, 2017. See Dkt. 45;
Complaint, Dkt. 1. Defendants argue that all four claims - Counts
I, II, V, and VI of plaintiff's complaint - fail on the undisputed
facts and that, in addition, three of these claims are time barred
as a matter of law. See Memorandum of Law in Support of Defendants'
Motion for Summary Judgment ("Def. Mem."), Dkt. 46. Plaintiff
opposes. See Plaintiff's Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment ("Pl. Opp."), Dkt. 49.

     Also before the Court is the motion of Tesla to vacate the
Court's Opinion and Order dated December 15, 2017 dismissing on
the pleadings Counts VIII and IX of plaintiff's complaint. See
Letter dated April 3, 2018 ("Pl. Ltr."), Dkt. 60. Tesla argues

1

that these claims should be reinstated now that New York's First Appellate Division has vacated a related New York State Supreme Court judgment. Id. at 2. Defendants oppose. See Letter dated April 6, 2018 ("Def. Ltr."), Dkt. 62.

For the reasons set forth below, the Court grants defendants' motion for summary judgment in full, dismissing Counts I, II, V, and VI with prejudice. With respect to plaintiff's motion regarding Counts VIII and IX, as discussed further herein, the Court will permit the parties to reopen discovery on these claims and, thereafter, to submit full briefing on the question of whether these claims should be reinstated and, if so, whether summary judgment is warranted.

The pertinent facts, either undisputed, or, where disputed, taken most favorably to plaintiff, are as follows:

Defendant Related is a privately-owned real estate firm that manages the development, acquisition, management, financing, marketing, and sales of residential, retail, and office properties. See The Related Companies, L.P., New Hudson Facades LLC, and MBM Supply LLC's Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motions for Summary Judgment ("Def. 56.1 St.") ¶ 6, Dkt. 47; Carleton Ruthling, Tesla Walls LLC, Hudson Walls LLC, Skye Holdings Ltd. and Tesla Wall Systems LLC's Response to Plaintiffs' Rule 56.1 Statements of Undisputed Facts ("Pl. Reply 56.1 St.") ¶ 6, Dkt. 51. Co-defendant New Hudson Facades LLC

2

("NHF") is a limited liability company specializing in the design, engineering, and manufacturing of, inter alia, curtain wall, see id. ¶ 20, a type of glass and aluminum façade used in high-rise buildings.

Tesla is a Delaware limited liability company, id. ¶ 12, with its principal place of business in Las Vegas, Nevada, id. ¶ 50.[1] Tesla's sole member is Carleton Ruthling, id. ¶ 47, an engineer, id. ¶ 7. Ruthling formed Tesla on September 6, 2011, id. ¶ 49, pursuant to an oral agreement with Related that Related would fund Tesla, id. ¶ 53, and Ruthling would run it, id. ¶ 47. Although Related and Ruthling were never able to execute a formal, written operating agreement, id. ¶ 73, Ruthling was named as the managing member and chairman of Tesla in every draft the parties contemplated, id. ¶ 47, and is named as the managing member in the Certificate of Formation filed in Delaware, id. ¶ 49.

On November 28, 2012, Ruthling and Related executed a two-page term sheet naming Skye Holdings Ltd. Samoa ("Skye Holdings"), a limited liability company formed in Hong Kong and owned in part by Ruthling, see id. ¶ 17, as 75% owner of Tesla and Related as 25% owner of Tesla, id. ¶ 68. Although the Term Sheet includes no

---

[1] Plaintiff's responding 56.1 Statement skips over paragraph 36 of defendants' 56.1 Statement. Accordingly, plaintiff's response to defendants' paragraph 50 is numbered paragraph 49. The paragraph numbers in this Opinion and Order correspond to those used in defendants' moving 56.1 Statement.

substantive guidance for the day-to-day operations of the business, see Reply to the Ruthling Parties Response to Related's Local Rule 56.1 Statement of Undisputed Facts in Support of Related's Motions for Summary Judgment and the Ruthling Parties' Counter Statement of Undisputed Material Facts ("Def. Reply 56.1 St.") ¶ 9, Dkt. 54, it does provide for the distribution of "Available Cash" in a "Waterfall," first, in "payment of taxes," then, in "repayment of all project cash advances [to Related] with accrued interest," then, 60% to Related and 40% to Skye Holdings until existing loans from Related are repaid, and finally, 25% to Related and 75% to Skye Holdings, see Tesla Wall Systems LLC Tentative Term Sheet dated November 28, 2012, Dkt. 143-11, No. 17 Civ. 4175.

Tesla's business was to source curtain wall in Asia, ship it to the United States, and install it on the exterior of Related's buildings. See Def. 56.1 St. ¶ 38. In addition to earning income as a subcontractor on Related's developments, Tesla also received cash advances from Related totaling over $15 million. Id. ¶¶ 84, 382. These payments were designed in part to help Tesla develop a successful business. Tesla, however, never turned a profit, see id. ¶ 199, and, at a meeting on August 1, 2013, Related informed Ruthling that it was considering withdrawing its support for the venture, id. ¶ 224.

Thereafter, Tesla's number two executive, Michael Budd, "a curtain wall expert with over 30 years of experience in the field," id. ¶ 55, sought a meeting with Related to discuss its "perspective on the future of Tesla and my role and opportunities going forward," id. ¶ 228. Prior to joining Tesla, Budd led a team of 300 people at the largest custom cladding company in the world, helping to build the Petronas Towers and the Getty Museum. Id. ¶ 56. Although Budd was initially concerned about leaving a big company to join a startup like Tesla, he thought that Tesla offered a "great opportunity to work with Related." Id. ¶ 58; id. (citing an Email from Brenner to Ruthling dated April 28, Ex. 32, Declaration of Nicholas A. Gravante, Jr. in Support of Related Companies, L.P., MBM Supply Co. LLC, and New Hudson Facades' Motions for Summary Judgment ("Gravante Decl."), Dkt. 48-3 ("I reassured him that we had great confidence in you and the Company and are committed to financial support. He is concerned about going from a big company to a startup")).

With Ruthling's knowledge, Related hired Budd to serve as a consultant on a New York building project unrelated to Tesla. Id. ¶ 227. Ruthling did not object to Budd's doing consulting work for Related; he even wrote to Budd that Related's interest in securing his services "would likely be good." Id. But if Ruthling thought that Related's interest in working with Budd would lead Related to decide not to pull the plug on Tesla, he was wrong. Id. ¶¶ 233,

5

238. By October, Related had decided to stop the business. Id. ¶ 233 (Ruthling noting that Related had "stopped the business"); id. ¶¶ 234, 256.

Also in October, Related sought to "finalize a deal with Budd," ideally before commencing the "orderly wind down of Tesla." Email from Stephen Ross to Ken Wong dated October 15, 2013, Ex. 25, Declaration of Lawrence A. Dany III ("Dany Decl."), Dkt. 52-3. Related's executives thought that Budd's services would be valuable going forward. See Email from Brenner to Loughran dated September 16, 2013, Ex. 21, Dany Decl. (explaining that Budd "is a valuable resource given the volume of work we have on the horizon" and that Related should "see if there is anything we can work out that would be beneficial to both of us").

On March 8, several months later and with Tesla winding down, Budd gave Ruthling his 60-days' notice. Def. 56.1 St. ¶ 325. Around this time, Related approached a longtime manufacturer of glass and metal products named Allen Cohen about developing a new curtain wall manufacturing facility in Pennsylvania to supply Related's projects. Id. ¶ 318. On March 19, without telling Ruthling and while still employed by Tesla, Budd traveled to Pennsylvania to meet with Cohen. Id. ¶ 331. The purpose of Budd's trip was to see Cohen's operations, visit a possible site for a new factory, and discuss a business plan. Id. ¶ 331.

6

On April 16, 2014, Ruthling wrote an email intended for a Related executive in which he accused Budd of "self-dealing" in violation of his "duty of loyalty to Tesla." Id. ¶ 261. Ruthling explained that when Budd joined Tesla he signed up with Tesla, not with Related, and that his contract includes a non-interference clause. See Email from Ruthling dated April 16, 2014, Ex. 265, Gravante Decl., Dkt. 48-16. He further noted that Related, having reviewed and approved Budd's contract, was aware of the non-interference clause. Id. On April 24, Ruthling emailed Related to say that Budd had "clearly interfered with Tesla's primary business interest and this was done with the knowledge of/supported by Related." Def. 56.1 St. ¶ 264. On May 2, 2014, Ruthling emailed Budd accusing him of breaching his fiduciary duties to the company. Id. ¶ 265.

On May 5, 2014, NHF was established. Id. ¶ 335. On or around May 8, 2014, Budd joined Related as a Senior Vice President. Id. ¶ 336. On July 16, Ruthling wrote to a colleague that Related was backing what he called Budd's "new company." Id. ¶ 270. In late July, Related, Ruthling, and their attorneys exchanged redlines of a wind down agreement. Id. ¶ 268. As part of that agreement, Related sought a release from any claims Tesla might have against Related or its affiliates in connection with Budd's work for Related. See Closeout Agreement dated July 31, 2014 ¶ 12, Ex. 297, Gravante Decl., Dkt. 48-19 ("This mutual release includes but is

not limited to a mutual release of all claims of any kind whatsoever, whether known or unknown, resulting from Related's or its affiliates' past or future retention of Michael Budd ("Budd"), as an employee, consultant or otherwise."). On July 31, 2014, Tesla ceased operations. See Def. 56.1 St. ¶ 165. On August 13, 2014, the negotiations between Ruthling and Related broke down and the wind down agreement was never executed. Id. ¶ 271.

A few weeks later, Tesla filed suit against Budd for breach of contract and breach of fiduciary duty in the Southern District of New York. See Tesla Wall Systems v. Budd, No. 14 Civ. 8564 (S.D.N.Y. 2014). On November 29, 2016, a jury found Budd liable and awarded Tesla $14.5 million in damages.[2] See Dkt. 87, No. 14 Civ. 8564. Thereafter, on February 17, 2017, Related brought suit, inter alia, against Ruthling for fraud. See Related Companies, L.P. v. Ruthling, No. 17 Civ. 4175 (S.D.N.Y. 2017). On July 7, Ruthling moved to dismiss Related's complaint. Id. at Dkt. 66. On August 4, this Court issued a bottom-line Order denying Ruthling's motion to dismiss. Id. at Dkt. 81. Three days later, on August 7, 2017, Tesla filed the instant action against Related and NHF. See Dkt. 1. On October 6, 2017, defendants moved to dismiss Tesla's complaint. See Dkt. 21. By Opinion and Order dated December 15,

---

[2] The $14.5 million damages award was subsequently vacated. See Opinion and Order dated April 26, 2017, No. 14 Civ. 8564, Dkt. 130. Prior to retrial on damages, the case settled. See Notice of Settlement, No. 14 Civ. 8564, Dkt. 172.

8

2017, the Court dismissed four of Tesla's claims, including Counts VIII and IX. See Dkt. 37.

Defendants, as mentioned, now seek summary judgment on plaintiff's remaining claims: Counts I, II, V, and VI. Defendants argue, inter alia, that Count I for misappropriation of trade secrets fails because plaintiff has not identified any trade secret information or any evidence of misappropriation by Related; Count II for unfair competition fails because plaintiff has not identified any confidential information or evidence of misappropriation by Related; Count V for breach of fiduciary duty fails because, as a passive investor, Related does not owe a fiduciary duty to Tesla; and Count VI for aiding and abetting breach of fiduciary duty is time barred as a matter of law. Plaintiff opposes and, in addition, moves to reinstate Counts VIII and IX for fraud and unjust enrichment. Plaintiff argues that the Court should vacate its prior dismissal because a basis for its decision – a New York State Supreme Court judgment – was recently vacated by New York's First Appellate Division.

The Court considers each of these arguments in turn:

## I.  **Count I: Misappropriation of Trade Secrets**

Count I of plaintiff's complaint is for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 or DTSA. See 18 U.S.C. § 1839 et seq.

The DTSA defines "misappropriation" as the (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or [the] (B) disclosure or use of a trade secret of another without express or implied consent by a person who —

  (i)    used improper means to acquire knowledge of the trade secret;

  (ii)   at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was — (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

  (iii)  before a material change of the position of the person, knew or had reason to know that — (I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5).

By its terms, the DTSA "applies only to acts of misappropriation that occur on or after the date of the enactment of th[e] Act, May 11, 2016." Champions League, Inc. v. Woodard, 224 F. Supp. 3d 317, 326 (S.D.N.Y. 2016) (internal quotation omitted). A DTSA claim may be valid, however, where the plaintiff can establish that the defendant used trade secrets without consent on or after May 11, 2016 in violation of § 1839(5)(B).

Plaintiff here argues that defendants misappropriated trade secrets (1) by acquiring trade secret information from Budd, knowing that Budd was under a fiduciary and contractual obligation not to divulge the information and (2) by disclosing and using the information knowing that it had been acquired through improper means. See Pl. Opp. at 19.

As it is incontrovertible that any information "acquired" by defendants from Budd was acquired prior to May 2016, plaintiff cannot establish misappropriation on this first basis as a matter of law. See The Ruthling Parties' Counter Statement of Undisputed Material Facts in Opposition to Motions for Summary Judgment ("Pl. 56.1 St.") ¶ 37, Dkt. 50 ("in 2013, Related began working secretly with Tesla's then-President, Michael Budd, to destroy Tesla and form a competing business"); id. ¶ 41 (in "December 2013, Budd provided Related with a copy of Tesla's proprietary business plan"); id. ¶ 48 (someone "told Dr. Ruthling, on August 8, 2014, that Related had acquired a competing curtainwall company and that

11

Budd was running it"); Fed. R. Civ. P. 30(b)(6) Deposition of Tesla
Wall Systems LLC dated Nov. 15, 2017 at 259, Ex. 12, Declaration
of Lawrence A. Dany III ("Dany Decl. II"), Dkt. 143, No. 17 Civ.
4175 (Ruthling testifying that Tesla closed in or around July 31,
2014).

Nor does Tesla point to any evidence of use or disclosure
after May 2016. Indeed, Tesla cites in support only to a factual
assertion regarding defendants' acquisition of Tesla's purported
trade secrets. See Pl. Opp. at 19 (citing Pl. 56.1 St. ¶ 37); Pl.
56.1 St. ¶ 37 (asserting that beginning in 2013, "Related began
working secretly with Tesla's then-President Michael Budd, to
destroy Tesla and form a competing business, New Hudson Facades").
This factual assertion is supported by only three emails, all of
which date to 2013 and none of which suggests use of trade secret
information. See Email from Brenner to Loughran dated July 8, 2013,
Ex. 17, Dany Decl. II (stating that "[b]ringing [Budd] in will
cause more problems than not"); Email from Loughran to Brenner
dated September 17, 2013, Ex. 27, Dany Decl. II (questioning
"whether RLP has the stomach to deal with this [figuring out a way
to continue working with Budd] going forward"); Email from Budd to
Brenner dated October 4, 2013 ("Budd to Brenner Email"), Ex. 28,
Dany Decl. II (attaching a copy of his employment agreement with
Tesla).

12

Although plaintiff's 56.1 Statement includes five other related factual assertions, see Pl. 56.1 St. ¶¶ 41-44, 51, these are either irrelevant to the question of use after 2016 or unsupported by evidence. For example, Tesla contends that Budd sent Tesla's proprietary business plan to Related, id. ¶ 41, but Tesla cites in support only an inapposite one-sentence email attaching a copy of Budd's employment agreement, see Budd to Brenner Email ("attached is a copy of my employment agreement with Tesla Walls Systems"). Tesla asserts that Budd drafted a business plan for a new curtain wall business that was "virtually identical" to Tesla's, see Pl. 56.1 St. ¶ 42, but Tesla cites in support only an email chain that does not include either plan, see Email from Trovini to Cohen and Budd dated March 24, 2014 ("Trovini Email"), Ex. 23, Declaration of Lawrence A. Dany III ("Dany Decl. III"), Dkt. 158, No 17 Civ. 4175 (explaining that they "don't need to reinvent the wheel" as "the document Mike Bud[d] created for a prior exercise is a good start").[3] Tesla asserts that Related was excited about various documents Budd allegedly pilfered, Pl. 56.1 St. ¶ 43, but it is not clear from the record what documents these are and whether they were pilfered. Tesla asserts that shortly

---

[3] Moreover, defendants argue, and plaintiff does not controvert, that this email is taken out of context and refers to an unrelated business proposal that Related did not pursue. See Def. Reply 56.1 St. ¶ 42.

13

after its formation "NHF was named as the curtain wall fabricator on several of Related's major projects," id. ¶ 44, but this is probative of little more than the fact that Related started NHF to produce curtain wall domestically. Tesla also asserts that "Dr. Ruthling testified that NHF was using Tesla's trade secrets at the time of the Budd trial," id. ¶ 52, but Tesla cites no such testimony.

Simply put, while Tesla asserts in its brief that defendants misappropriated "whole sections of Tesla's business plans, reflecting and consisting of Tesla's trade secret information," Pl. Opp. at 20, Tesla, following full and extensive discovery, does not cite any evidence to support this assertion. Indeed, Tesla has not even identified with the requisite specificity what trade secrets were allegedly misappropriated.[4] But even if Tesla had adequately identified some trade secrets in issue, Count I would

---

[4] In support of Count I, plaintiff cites only to Ruthling's testimony. See Pl. Opp. at 14-15 (citing Pl. 56.1 St. ¶ 54 (citing the Fed. R. Civ. P. 30(b)(6) depositions of Tesla and Tesla II)). Ruthling's testimony consists largely of Ruthling's assertions that Tesla used "different processes," "different billings," and different pricing. Def. Reply 56.1 St. ¶ 54. But trade secret claims lacking "sufficient particularity" cannot survive on summary judgment. Big Vision Private Ltd. V. E. I. DuPont De Nemours & Co., 1 F. Supp. 3d 224, 263 (S.D.N.Y. 2014). Ruthling's assertions that Tesla owned an unspecified "unique compilation" of data is not the "concrete evidence that [Tesla's] business method uniquely strung together certain elements in a particular way" that plaintiff must adduce to sustain this claim. Sit-Up Ltd. v. IAC/InterActiveCorp., No. 05 Civ. 9292, 2008 WL 463884, at *10 (S.D.N.Y. Feb. 20, 2008).

14

still fail because plaintiff asks the Court to accept that because defendants continued to source curtain wall after they ceased doing business with Tesla – including with people who used to work for Tesla – defendants must have stolen Tesla's (unspecified) trade secret information and are using it to this day. Such a leap is wholly unmerited. As no reasonable juror could conclude from the evidence presented by plaintiff that defendants misappropriated Tesla's trade secret information (assuming it had any) on or after May 11, 2016, the Court grants defendants' motion for summary judgment on Count I.

## II. **Count II: Unfair Competition**

Defendants also seek summary judgment on Count II, plaintiff's claim for unfair competition. Defendants argue that summary judgment is warranted because plaintiff has failed to identify any misappropriated confidential information. See Def. Mem. at 12-15.

Under New York law, a plaintiff may prevail on an unfair competition claim premised on misappropriation even where the misappropriation of information "does not rise to the level of misappropriation of trade secrets or ideas." LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 501 (S.D.N.Y. 2002). According to plaintiff, Tesla's protectable property here includes all of the "labor, skill, and expenditures" that went into developing the Tesla business model. Pl. Opp. at 22 (citing LinkCo, 230 F. Supp.

2d at 502). But Tesla points to only three paragraphs in its 56.1 Statement in support of its claim: Paragraph 3 stating that "Dr. Ruthling spent years researching and developing the framework" for Tesla, "an entity intended to be a first-of-its-kind, vertically integrated façade company," Pl. 56.1 Ct. St. ¶ 3 (citing only Ruthling's testimony); Paragraph 4 stating that Ruthling "obtained an aero mechanical engineering degree from the University of Virginia, an MS [in] aero mechanical engineering from George Tech, and a Ph.D. in mechanical engineering from Stanford," id. ¶ 4 (citing only Ruthling's testimony); and Paragraph 5 stating that "Tesla was able to deliver curtain wall to Related for multiple major projects at prices far below what any other supplier could offer," id. ¶ 5 (citing only the deposition testimony of Michael Brenner).[5]

Although plaintiff argues that the "weight" of this evidence "may only be decided by a jury," Def. Opp. at 22, the evidence is not even materially relevant to the question of whether Tesla possessed confidential information. All this testimony shows is that Ruthling was highly educated, that he spent time developing Tesla, and that Tesla won two contracts to source curtain wall for Related's building projects. This evidence does not address what

---

[5] Brenner's testimony states in relevant part that Tesla bid lower than the rest of the market on the NLSD and WWD projects. See Deposition of Michael Brenner dated December 11, 2017 at 202-204, Ex. 2, Dany Decl., Dkt. 53-2.

16

information Tesla used to do its business or why it was confidential.

Nor does plaintiff demonstrate misappropriation. All plaintiff argues on this point is that "there is abundant evidence that (1) Related acknowledged, and indeed conceded, the proprietary nature of the Tesla business model; and (2) worked secretly with Tesla's former President, Michael Budd, to use Tesla's business model to form a competing company." Pl. Opp. at 23. But none of the eight paragraphs plaintiff cites in its 56.1 Statement in support of these contentions, Pl. 56.1 St. ¶¶ 37-45, raise a genuine issue of material fact regarding any information that was used by Related.

For example, one paragraph that asserts Budd provided Related with a copy of Tesla's proprietary business plan cites only to an email in which Budd sends Related a copy of his employment contract. See Budd to Brenner Email. Another paragraph that asserts that Budd drafted a virtually identical business proposal for Related does not cite either proposal. See Pl. 56.1 St. ¶ 42. As on its DTSA claim, Tesla's argument with respect to Count II rests simply on Tesla's contention that Related improperly hired Budd and thereafter, with Budd's help, continued to build buildings and source curtain wall for those buildings. But the law does not prevent a company from exercising its "legal rights" to start a new venture, Big Vision, 1 F. Supp. 3d at 275, and defendants do

17

not claim here that Related's improper hiring of Budd itself constitutes unfair competition. Accordingly, the Court grants defendants' motion for summary judgment on Count II.

### III. Count V: Breach of Fiduciary Duty

Defendants argue, inter alia, that plaintiff's breach of fiduciary duty claim fails because, as a passive investor, Related owed no fiduciary duty to Tesla. See Def. Mem. at 16-20.

In Delaware, "while managers and managing members [of an LLC] owe default fiduciary duties, passive members do not, absent a modification of the LLC agreement or facts suggesting that the purportedly passive member was acting in a managerial capacity." CMS Inv. Holdings, LLC v. Castle, No. Civ. 9468, 2015 WL 3894021, at *18 (Del. Ch. Jun. 23, 2015); Imbert v. LCM Interest Holding LLC, No. Civ. 7845, 2013 WL 1934563, at *7 (Del. Ch. May 7, 2013) ("Delaware law imposes no default fiduciary duties on non-managing, non-controlling members of limited liability companies").

According to plaintiff, Related here "assume[d] fiduciary duties" by taking "an active role in the management of" Tesla. Pl. Opp. at 23. But plaintiff points only to the Term Sheet, which provides Related with approval rights over third-party work and executive hiring, see Pl. 56.1 St. ¶ 7, and correspondence between

Ruthling and Related suggesting that Related's executives considered Related to be a "partner" in the venture, id. ¶ 17.[6]

On their own, "approval rights" are not sufficient to show an active role in management. Not only are such rights commonplace among passive LLC investors, see, e.g., Feeley v. NHAOCG, LLC, 62 A.3d 649, 654 (Del. Ch. 2012) (noting that non-managing member had "approval rights over certain major decisions"); 2009 Caiola Family Trust v. PWA, LLC, No. 8028, 2014 WL 1813174, *3 (Del. Ch. Apr. 30, 2014) (noting that non-managing member had certain approval rights), but also such rights do not create fiduciary duties absent evidence they were exercised to manage and direct the company, see, e.g., Palmer v. Moffat, No. 01 Civ. 03-114, 2001 WL 1221749, *2-3 (Del. Sup. Ct. Oct. 10, 2001) (noting that an LLC operating agreement giving members "full, exclusive and complete discretion, power and authority . . . to manage, control, administer and operate the business and affairs of the company" did not make each member a "manager").

As regards Tesla's contention that Related considered itself an "equal partner" in the venture, Pl. 56.1 St. ¶ 17, Tesla cites

---

[6] Plaintiff also argues that Related had a fiduciary duty because it had access to Tesla's "confidential information." See Pl. Opp. at 24. This argument is both without basis in fact and unavailing as a matter of law. See Kuroda v. SPJS Holdings, L.L.C., No. 4030, 2010 WL 925853, at *3, 7-8, n.28 (Del. Ch. Mar. 16, 2010) (rejecting the "entirely baseless" argument that a minority LLC member with access "to high-level proprietary and confidential information" had a fiduciary duty to the company).

19

in support three emails from a Related executive named Michael Brenner in which Brenner states that Related is Ruthling's partner in Tesla. See Email from Brenner to Ruthling dated May 7, 2013, Ex. 16, Dany Decl., Dkt. 53-2 (Related "is your partner who has invested over $12 million in our venture"); Email from Brenner to Ruthling dated February 22, 2013, Ex. 71, Dany. Decl., Dkt. 53-8 (stating that Related "invested $3 million to obtain an ownership interest" in Tesla, "advanced over $9 million to fund operations," and "[w]e are partners"); id. (stating that "[t]his is not a vendor/customer relationship"); Email from Brenner to Ruthling dated September 5, 2012, Ex. 72, Dany Decl., Dkt. 53-8 (requesting more information about cash flows and stating "[w]e are partners").

Under Delaware law, however, the use of the word "partner" does not transform a minority LLC investor into a partner in the eye of the law. See, e.g., Ramone v. Lang, No. 1592, 2006 WL 4762877, at *13 (Del. Ch. Apr. 3, 2006). Nor does plaintiff cite any case where a court found that these sorts of exchanges created a fiduciary duty where such a duty did not otherwise exist. Moreover, these exchanges (along with many others in the record) suggest that, far from being an actual partner in the venture, Related had no ability to see even basic financial or operational information about Tesla without Ruthling's approval. Indeed, Ruthling himself has stated on several occasions that he is the person authorized to manage Tesla. See Def. 56.1 St. ¶ 75 (quoting

20

Ruthling testifying that he is "responsible for the operations of the company" including "the financial and accounting aspects of the business"); id. (quoting Ruthling testifying "I [] ran the operations [of Tesla] as the chairman of the company").

Accordingly, as plaintiff has failed to identify any facts tending to show that Related acted in a managerial capacity in Tesla's operations, the Court finds that Related had no fiduciary duty to Tesla as a matter of law and dismisses Count V.

## IV. Count VI: Aiding and Abetting Breach of Fiduciary Duty

Count VI of plaintiff's complaint is against Related for aiding and abetting Budd's breach of fiduciary duty. Defendants argue, inter alia, that Count VI is time barred under the applicable three-year statute of limitations. See Def. Mem. at 21.

The undisputed facts show that Ruthling directly accused Related of aiding and abetting Budd's breach in several emails dated as early as April 2014. See Email from Ruthling to Brenner dated April 24, 2014, Ex. 269, Gravante Decl., Dkt. 48-15 (referencing "the interference of Michael Budd and facilitation by RLP of that interference" and stating that "RLP has taken the services of Mike Budd" and, therefore, "greatly decreased the ability of Tesla 2 to survive as a company"); Email from Ruthling to Brenner dated April 24, 2014, Ex. 270 (stating that "my #2 [Budd] clearly interfered with Tesla's primary business interest and this was done with the knowledge of/supported by Related" and

21

that "Tesla has been damaged, perhaps irreparably"). Related even sought a release from Tesla in July 2014 for any claims Tesla might have against Related arising from Related's activities with Budd.

Rather than dispute these facts, plaintiff points merely to evidence of what Ruthling did not know prior to August 8, 2014, namely that Budd and Related had collaborated in starting a new company called NHF to manufacture curtain wall. See Pl. 56.1 St. ¶ 48 ("[a] fellow businessperson told Dr. Ruthling, on August 8, 2014, that Related had acquired a competing curtainwall company and that Budd was running it"); id. ¶ 49 ("Ruthling also did not learn that Budd had met with Related executives to discuss forming NHF, developed a business plan for NHF, or made arrangements for suppliers and financing before August 2014."). But the fact that Tesla became aware, after August 7, 2014, of additional details regarding Related's relationship with Budd is inapposite. Tesla plainly was aware prior to August 7, 2014 that Related had colluded with Budd, in violation of his fiduciary duties to Tesla, so as to "interfere" with Tesla's "primary business interest."

In the alternative, plaintiff argues that Related should be equitably estopped from raising this limitations defense because Related fraudulently induced plaintiff to delay in filing its action. See Pl. Opp. at 8-9 (citing Pl. 56.1 St. ¶ 46 ("Related and Budd fraudulently concealed their activities from Tesla, preventing it from discovering its claims until after August 8,

2014"); id. ¶ 47 ("Tesla acted in reliance upon Related's misrepresentations about its intentions during the relevant period")). Equitable estoppel "requires proof that the defendant made an actual misrepresentation or, if a fiduciary, concealed facts which he was required to disclose, that the plaintiff relied on the misrepresentation and that the reliance caused plaintiff to delay bringing timely action." Kaufman v. Cohen, 760 N.Y.S.2d 157, 167 (App. Div. 2003). Plaintiff here argues that Related owed Tesla a duty as a partner in the business and therefore was obligated to disclose "its various attempts to replace Tesla with a competing curtain wall company." Pl. Opp. at 10. But as discussed above, Related was not a partner in Tesla and had no duties on that basis.[7]

Accordingly, as Tesla plainly knew the predicates of its aiding and abetting claim against Related more than three years prior to bringing this action, the Court finds that Count VI is time barred as a matter of law.

## V. Counts VIII and IX: Fraud and Unjust Enrichment

Separately, as mentioned earlier, Tesla moves to vacate the Court's prior order of December 15, 2017 dismissing Counts VIII

---

[7] Moreover, the Court is not inclined to apply equitable estoppel here where Tesla brought its action against Budd for breach of fiduciary duty in October 2014, shortly after the relevant events transpired, and with no explanation waited until August 2017 to bring an action against Related for aiding and abetting Budd's breach. This delay does a gross disservice to the district court as a whole, which held a trial in the Budd case in 2016.

23

and IX of Tesla's complaint. As set forth in the Opinion and Order of that date, the Court, in reaching this decision, found relevant a New York State Supreme Court judgment awarding to Tesla, as an offset, the same $3.3 million Tesla seeks in connection with Counts VIII and IX. Separately, however, on March 27, 2018, New York's First Appellate Division vacated that Supreme Court judgment. See Decision and Order in The Related Companies, L.P. v. Tesla Wall Systems, LLC, No. 15 Civ. 650778 (N.Y. App. Div. Mar. 27, 2018), Dkt. 59-1. Plaintiff argues that, therefore, the Court should vacate its prior order. See Pl. Ltr. (citing Fed. R. Civ. P. 60(b)(5)).

Defendants argue that vacatur of the Supreme Court judgment is of no moment because the parties are still proceeding on remand on the basis that Tesla is entitled to the $3.3 million offset. See Def. Ltr. at 2. In the event the Court reinstates these counts, defendants seek leave to move for summary judgment on them. Id.

It is possible, however, that further discovery may now be necessary before the Court can rule on any summary judgment motion on these Counts. Accordingly, the Court will allow the parties to briefly re-open discovery and pursue additional discovery, but only as related to these Counts and only until June 8, 2018. Following such discovery (if any), defendants shall have until June 15 to make a motion for summary judgment and/or to submit a brief arguing that the Court should deny plaintiff's motion to

24

vacate the December 15, 2017 Opinion and Order. Plaintiff shall have until June 15 to make a motion for summary judgment and until June 29 to answer any motion for summary judgment made by defendants and/or to respond to any arguments made by defendants opposing vacatur of the December 15, 2017 Opinion and Order. Defendants shall likewise have until June 29 to answer any motion for summary judgment made by plaintiff. Replies to any summary judgment motion must be submitted by no later than July 6.

## VI. Conclusion

For the reasons stated above, the Court grants defendants' motion for summary judgment on Counts I, II, V, and VI, dismissing them with prejudice. The Court further permits limited discovery and supplemental briefing and motion practice with respect to Counts VIII and IX, as set forth above.

The Clerk of Court is hereby instructed to close docket entry number 45.

SO ORDERED.

Dated:  New York, NY
        May 13 2018

JED S. RAKOFF, U.S.D.J.